**In re AFRICO EXPLORATIONS, INC., Debtor.**

**In re WOCO, INC., Debtor.**

**In re MIDWEST DIVERSIFIED INVESTMENT, INC., Debtor.**

**Bankruptcy Nos. 86–10946– 7 to 86–10948–7.**

United States Bankruptcy Court, D. Kansas.

Oct. 7, 1992.

Edward J. Nazar, Redmond, Redmond & Nazar, Wichita, Kan., for debtors.

Joseph L. McCarville III, Rauh, Thorne, Childs, O'Sullivan, McCarville & Brown, Hutchinson, Kan., for Bd. of County Com'rs of Reno County, Kan.

Robin B. Moore, Asst. U.S. Atty., for U.S., on behalf of its agency, the Small Business Admin.

Susan G. Saidian, Morrison, Hecker, Curtis, Kuder & Parrish, Wichita, Kan., for F.D.I.C.

William F. Bradley, Hinkle, Eberhart & Elkouri, Wichita, Kan., for Opportunity Capital Corp.

D. Michael Case, trustee for debtors.

John E. Foulston, Wichita, Kan., U.S. Trustee.

## MEMORANDUM OPINION

JOHN T. FLANNAGAN, Bankruptcy Judge.

The debtors, Woco, Inc. ("Woco"), Africo Explorations, Ltd. ("Africo"), and Midwest Diversified Investment, Inc.[1] originally filed Chapter 11 petitions on April 16, 1986. When the Court converted the three cases from Chapter 11 to Chapter 7 on February 17, 1989, it appointed D. Michael Case as trustee in each case. The bankruptcy estates contained oil and gas leases that were collateral on secured claims held by the Small Business Administration ("SBA") and the Federal Deposit Insurance Corporation ("FDIC"). The trustee sold the oil and gas leases with all liens transferring to the sale proceeds. He then filed an "Application for an Order Approving and Confirming Sale Free and Clear of Liens and Encumbrances of Record and Dispersal of Proceeds." The trustee's application proposed to distribute $465,081.54 to Reno County, Kansas ("Reno County") to satisfy its personal property tax claim which it maintains was secured by a first lien on the sale proceeds under Kansas Statutes Annotated § 79–2020. Reno County has filed a brief in support of the distribution. Secured claim holders, SBA and FDIC, have objected to the trustee's application and to Reno County's claim. Each has filed a brief in opposition to the Reno County position. Another secured claim holder, Opportunity Capital Corporation, has joined in the briefs of the SBA and the FDIC opposing the distribution, but it is not otherwise mentioned in the briefs. The trustee and

Sedgwick County, Kansas, have not filed briefs.

The debtors appear by their attorney, Edward J. Nazar of Redmond, Redmond & Nazar, Wichita, Kansas. The Board of County Commissioners of Reno County, Kansas, appears by its attorney, Joseph L. McCarville III of Rauh, Thorne, Childs, O'Sullivan, McCarville & Brown, Hutchinson, Kansas. The United States, on behalf of its agency, the Small Business Administration, appears by Robin B. Moore, Assistant United States Attorney. The Federal Deposit Insurance Corporation appears by its attorney, Susan G. Saidian of Morrison, Hecker, Curtis, Kuder & Parrish, Wichita, Kansas. Opportunity Capital Corporation appears by its attorney, William F. Bradley of Hinkle, Eberhart & Elkouri, Wichita, Kansas. The common trustee of all the debtors, D. Michael Case, also appears.

The Court finds that this proceeding is core under 28 U.S.C. § 157(b)(2)(A), (B), (K), (N), and (O).

The Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984.

I

The parties agree that the meaning and effect of K.S.A. 79–2020 is central to their controversy. It provides:

**Voluntary transfer of personal property before tax paid; lien; exception; collection.** If any owner of personal property *surrenders* or *transfers* such property to another after the date such property is assessed and before the tax thereon is paid, whether by voluntary repossession or any other voluntary act in reduction or satisfaction of indebtedness, then the taxes on the personal property of such taxpayer shall fall due immediately, and *a lien shall attach to the property so surrendered or transferred,* and shall become due and payable immediately. *Such lien shall be in preference to all other claims against such*

---

1. Except to say that it is a sister corporation of Africo, the briefs do not mention Midwest Diversified Investment, Inc.

*property.* The county treasurer, after receiving knowledge of any such surrender or transfer, *shall issue immediately a tax warrant* for the collection thereof and the sheriff shall collect it as in other cases. *The lien shall remain on the property and any person taking possession of the property does so subject to the lien.* The one owing such tax shall be liable civilly to any person taking possession of such property for any taxes owing thereon, but the property shall be liable in the hands of the person taking possession thereof for such tax. If the property is sold in the ordinary course of retail trade it shall not be liable in the hands of the purchasers. No personal property which has been *transferred in any manner after it has been assessed* shall be liable for the tax in the hands of the transferee after the expiration of *three years from the time such tax originally became due and payable.* (Emphasis added.)

L.1985, ch. 184, § 1; July 1.

The question presented is whether this statute gives Reno County a personal property tax lien on debtors' oil and gas leases superior to the liens of the SBA and the FDIC. Reno County argues that when the debtors filed their bankruptcy petitions, they transferred their oil and gas leases to the bankruptcy estate by operation of law. Reno County says that under the state statute, K.S.A. 79–2020, these transfers of leases to the bankruptcy estate were also voluntary "surrenders or transfers" of personal property that had been assessed for taxes that remained unpaid. Reno County claims that if this is so, the terms of the state statute create a tax lien on the transferred leases to aid its collection of debtors' previously due and payable personal property taxes. Under the terms of the state statute, the tax lien was "in preference to all other claims against such property," and, therefore, prior in right to the pre-

existing liens of the SBA and the FDIC on the leases, so the argument goes.

The SBA and the FDIC counter: (1) that the statute is unconstitutional or, in the alternative, should operate only prospectively; (2) that the filing of a bankruptcy petition does not constitute a "surrender or transfer" of personal property to the bankruptcy estate; (3) that the lien created by the statute upon the transfer of the leases to the bankruptcy estate does not attach in violation of the automatic stay; and (4) that Reno County is time barred from collecting the taxes by the terms of the statute itself.

The Court finds that K.S.A. 79–2020 was not intended to be applied retroactively to affect liens created before its enactment and that Reno County is not entitled to a lien for unpaid personal property taxes by virtue of the statute; therefore, the objections to the lien status of Reno County's claim are sustained for the reasons set out below.

II

Kansas classifies oil and gas leases and wells as personal property for purposes of valuation and taxation.[2] Taxpayers must list their personal property on the county tax rolls by January 1 each year and the county assesses the tax on that date.[3] The taxes become due on November 1.[4] Taxpayers have until the end of business on December 20 to pay either one-half of their personal property taxes or the full amount.[5] If they pay one-half of the tax liability on or before December 20, they can defer payment of the other one-half until June 20 of the following year, but they must pay interest on the full amount of the unpaid taxes.[6] If a taxpayer fails to pay at least one-half of the amount of assessed taxes on or before December 20, the full amount becomes immediately due and payable.[7]

If the first half of the taxes due are not paid by February 16 of the next year, or by

2. K.S.A. 79–329 (1923).

3. K.S.A. 79–301 (1965).

4. K.S.A. 79–1804 (1959).

5. K.S.A. 79–2004a (1992).

6. K.S.A. 79–2004a (1992).

7. K.S.A. 79–2004a (1992).

July 1 of the next year in the case of second half taxes, the county treasurer must mail notice to the assessed taxpayer between certain dates specified in the statute.[8] If the taxes remain unpaid 30 days after mailing of the notice, the county treasurer must issue a warrant directed to the sheriff of the county commanding him to levy upon the personal property of the assessed taxpayer for the amount of unpaid taxes and interest plus collection fees.[9]

A sheriff who collects a tax warrant must make immediate return thereon. If there are outstanding tax warrants, the sheriff must make return on all of them on or before October 1 of the year following the year in which the tax was levied. If the sheriff's return shows that a tax was not collected, the county treasurer must file with the clerk of the district court of the treasurer's county an abstract of the total amount of unpaid taxes and interest due plus penalties and costs. The clerk must enter the total amount of unpaid taxes on the appearance docket and note the entry in the general index.[10]

The total amount of taxes due becomes a judgment in the same manner and to the same extent as any other judgment under the code of civil procedure and becomes a judgment lien on real estate (only) from and after the time of filing of the abstract. Officials can file a transcript of the judgment in any other county and it becomes a lien upon real estate in that county. Execution, garnishment, and other proceedings in aid of execution on the judgment may be issued within the county or to any other county in the same manner as other judgments under the code of civil procedure.[11]

Upon filing the abstract with the clerk of the district court, the county treasurer must serve written notice of the filing on the county attorney. The county attorney's duty is to commence such proceedings as are necessary for the collection of the judgment.[12]

Purchasers of production from oil and gas leases are subject to a special notice procedure. If the taxes to be collected are upon oil and gas leases, the sheriff must notify the oil and gas lease production purchasers by registered mail of the delinquent tax amount. Upon receipt of the notice, production purchasers must pay the sheriff any proceeds they owe to the taxpayer for oil and gas purchases. The production purchasers must continue to pay these proceeds to the sheriff until the full amount of the taxes and costs are paid, after which they may resume payments to the taxpayer.[13]

III

The Court has spent considerable time and effort extracting the following undisputed facts from the various briefs, the stipulation, and documents in the official court file.

Woco and Africo operated oil and gas leases in several south-central Kansas counties from as early as 1977. Woco owned 19 leases; Africo owned 7 leases. Conoco, Inc. and National Cooperative Refinery Association were regular purchasers of production from the debtors' leases at relevant times.

The SBA holds a $350,000.00 secured claim that is evidenced by a promissory note and secured by a mortgage and security agreement, each dated September 2, 1977. The security instruments cover oil and gas leases owned by Woco in Rice, Reno, Butler and Sedgwick Counties.

The FDIC's secured claim is based on a mortgage dated August 13, 1981, which the FDIC acquired from the Bank of Commerce. The mortgage encumbers oil and gas leases owned by Africo.

The debtors were habitually delinquent paying the personal property taxes on their leases. Being short on cash, they usually paid only after warrants were issued.

8. K.S.A. 79–2101 (1990).

9. K.S.A. 79–2101 (1990).

10. K.S.A. 79–2101 (1990).

11. K.S.A. 79–2101 (1990).

12. K.S.A. 79–2101 (1990).

13. K.S.A. 79–2101 (1990).

Woco owed the county taxes on the leases that were due and payable on December 20 in each of the years 1982, 1983, 1984, and 1985. Africo owed taxes that were due on December 20 in each of the years 1983, 1984, and 1985. There is no indica-tion that the debtors ever paid the full amount or one-half of the taxes due for any tax year at issue. According to the Reno County brief, Woco owed $178,463.43 and Africo owed $97,451.92 for a total debt of $275,915.35.

In November of 1985, realizing that the debtors were becoming progressively slower to pay, the Reno County Sheriff notified production purchasers Conoco, Inc. and National Cooperative Refinery Association that the debtors' personal property taxes were past due. The purchasers received the notices on December 26, 1985. Upon receipt of the notices, the purchasers became obligated to suspend payments to the debtors and submit future payments to the Sheriff.[14]

The Reno County Sheriff had returned warrants against debtors under K.S.A. 79–2101 for tax years 1982, 1983, 1984, and 1985. On April 10, 1986, the Reno County Attorney issued garnishments for the tax years 1982, 1983, and 1984, which caused each of the debtors to file for Chapter 11 relief on April 16, 1986.

The next day, April 17, 1986, Conoco, Inc. and National Cooperative Refinery Association received service of the garnishment orders issued April 10, 1986, showing a judgment against Woco in the amount of $210,433.17. During the Chapter 11 proceeding, Conoco, Inc., held $70,937.08 from the purchases of lease production from Woco, Inc. and $39,569.99 from Africo Explorations, Ltd. The briefs do not say how much National Cooperative Refinery Association held.

Upon the filing of their Chapter 11 petitions, the debtors asked the Bankruptcy Court to order that the funds in the hands of the purchasers be released to the debt-ors-in-possession for use in the reorganization effort. The Court entered a favorable order on April 26, 1986, directing the funds suspended by Conoco, Inc. be released to the debtors and the funds suspended by National Cooperative Refinery Association be paid to Reno County as adequate protection payments on its lien.

The debtors attempted to reorganize under Chapter 11 for more than two years. Finally, on December 9, 1988, the FDIC filed a motion to convert the Chapter 11 cases to Chapter 7. The SBA joined in the motion. On December 17, 1988, the debtors objected to the conversion, but on February 17, 1989, the Court ordered conversion of the cases to Chapter 7 over debtors' objection.[15]

A common trustee for the cases, D. Michael Case, was appointed on March 24, 1989. On July 26, 1989, he sold the oil and gas leases free and clear of liens with the liens transferring to the proceeds of sale. Africo's oil and gas leases sold for approximately $513,869.00 in gross sale proceeds.

The briefs do not state when the trustee asked the Court to approve the sale and the disbursement of sale proceeds, but they do state that the trustee proposed to pay Reno County $465,081.54 from the sale proceeds for its lien. On November 6, 1989, the SBA filed an objection to the Application for an Order Approving and Confirming Sale Free and Clear of Liens and Encumbrances of Record and Dispersal of Proceeds. (SBA Brief, p. 3.)

At the time of the sale, there were personal property taxes due and owing to Reno County for the years 1982, 1983, 1984, and 1985, and Reno County had filed claims in the cases asserting a lien for the unpaid taxes.

On May 2, 1986, May 6, 1986, and March 30, 1989, the Sedgwick County Treasurer filed proofs of claim in the amount of $189.25, $17,196.12, and $1,793.72, respectively, for personal property taxes for the

14. K.S.A. 79–2101 (1990).

15. The court files reflect that The Honorable Stewart Rose ordered conversion of each case in open court on January 31, 1989, and that journal entries memorializing the order were filed in each case on February 17, 1989.

years 1981 through 1985 and the year 1988. (SBA Brief, p. 10.)

On February 9, 1990, the SBA objected to the claims of Reno and Sedgwick Counties and objected to the priority of the disbursal of proceeds. (SBA Brief, p. 3.) But, Sedgwick County has declined to file a brief in this contested matter.

The SBA filed a proof of secured claim in the Woco, Inc. bankruptcy in the amount of $120,191.95.

The FDIC and Reno County entered into the following stipulation of facts about the notices, warrants and returns, including provisions waiving claim for the 1982 taxes and showing that the Sheriff did not "execute the returns on the back of any tax warrants for past due taxes owed by debtors, nor did he impress, stamp or otherwise mark the back of each warrant."

## STIPULATION

Counsel for Federal Deposit Insurance Corporation ("FDIC") and Reno County Board of Commissioners ("County") stipulate to the following:

1. The County does not claim any amount due for taxes assessed for 1982 or prior years.

2. The Sheriff of Reno County or any of his deputies or assistants, or anyone on his behalf ("Sheriff") did not send notices for past due taxes by certified mail to debtor for any past due taxes.

3. The Sheriff did not keep copies of any notices to debtor regarding past due taxes that it may have sent.

4. The Sheriff did not execute the return on the back of any tax warrant for past due taxes owed by debtor, nor did the Sheriff impress, stamp or otherwise mark the back of each warrant. A copy of the front and back of a representative warrant is attached as Exhibit "A".

5. All warrants issued by the County Treasurer or any of her assistants ("Treasurer") are now in the possession of the Treasurer.

6. The clerk of the district court prepares cards for each tax warrant ("PT cards") based on information received from the Treasurer indicating the warrant number, the name and address of the taxpayer, the amount of the tax owed and whether any amounts have been credited to the amount owed. The PT cards do not have any attachments.

7. The PT cards for taxes assessed for the year 1983 were filed with the clerk of the Reno County District Court in October, 1984.

8. The PT cards for taxes assessed for the year 1984 were filed in October of 1985.

9. The PT cards for taxes assessed for the year 1985 were filed in October 1986.

The parties stipulate to the above and foregoing as relevant facts in lieu of the introduction of evidence to establish the same as fact.

## IV

■ Reno County does not dispute that the SBA and the FDIC hold perfected and enforceable liens against the oil and gas leases. The SBA's lien dates from 1977; the FDIC's from 1981. Neither does the County assert that its pre-bankruptcy collection procedures created a lien in its favor on the oil and gas leases. The County did not execute upon the property before the bankruptcy petition date so as to obtain a lien pre-petition. While the County's garnishment was issued pre-petition, it was not served until after the petitions were filed. The post-petition service was in violation of the automatic stay; hence, it was void. Moreover, the garnishment only reached money in the hands of purchasers of oil and gas runs, not the leases themselves. Thus, unless K.S.A. 79–2020 applies to create a paramount lien on the leases in favor of Reno County, the liens of the SBA and the FDIC prevail.

## V

■ Two Kansas bankruptcy appellate opinions have construed K.S.A. 79–2020. The first is an opinion by The Honorable Patrick F. Kelly, which Reno County relies upon in its brief, *In re Knights Athletic Goods, Inc.*, 98 B.R. 553 (D.Kan.1989)

("Knights I"). The second is an opinion by The Honorable Sam A. Crow rendered since the briefs were filed, *In re Knights Athletic Goods, Inc.*, 128 B.R. 679 (D.Kan. 1991) ("Knights II"). The *Knights* cases involve the statute in the context of a single Chapter 7 case. In *Knights I*, Judge Kelly holds that the filing of a Chapter 7 case resulted in the debtor's property being "voluntarily" turned over to the Chapter 7 trustee. The turnover was deemed to be a "surrender or transfer" of the property creating a tax lien within the meaning of the statute.

In *Knights II*, the trustee asked the bankruptcy court to avoid the lien created in *Knights I*. He argued that the tax lien was a statutory lien subject to avoidance under 11 U.S.C. § 545 and automatic preservation for the benefit of the bankruptcy estate under 11 U.S.C. § 551. On appeal, Judge Crow accepted Judge Kelly's conclusion that a lien was created by the statute upon transfer of the assessed property into the bankruptcy estate by the filing of a voluntary petition. At page 684 of *Knights II*, Judge Crow said:

> In short, the County's lien in this case arose when the debtor's property was transferred to the trustee upon the filing of the bankruptcy petition. The court concludes that the County's lien arising under K.S.A. 79–2020 is, by definition, a "statutory lien" within the meaning of the Bankruptcy Code. The tax arose automatically and was not based upon an agreement to give a lien. The court also concludes that the trustee may avoid that lien under 11 U.S.C. § 545(1)(A). See 4 Collier on Bankruptcy para. 545.01[1].

*In re Knights Athletic Goods, Inc.*, 128 B.R. 679, 684 (D.Kan.1991).

For this Court, the two opinions settle the question of whether the filing of a voluntary bankruptcy petition is a "surrender or transfer" of property within the meaning of K.S.A. 79–2020. The SBA and the FDIC argue that the cases at hand are distinguishable from *Knights I*[16] because they were originally filed as Chapter 11 cases and were converted to Chapter 7 only over the debtors' strenuous objection. They also contend that the filing of a Chapter 11 case is not a "transfer or surrender" by the owner of property which would amount to a "voluntary act in reduction or satisfaction of indebtedness" as defined by K.S.A. 79–2020. The Court disagrees with the position of the SBA and the FDIC on this transfer issue. Whether the case is filed under Chapter 7 or Chapter 11 makes no difference. In either event, under 11 U.S.C. § 541, as of the commencement of a case an estate is created comprised of all legal or equitable interests of the debtor in property wherever located and by whomever held. The petitioning debtor's property transfers into the estate when the case commences.[17]

## VI

No question was raised in either *Knights I* or *Knights II* about the propriety of applying K.S.A. 79–2020 to a lien that pre-existed the statute's effective date. However, here the SBA and the FDIC argue that the statute is unconstitutional because the County wishes to apply it to gain priority over liens that existed long before the statute was enacted. In the alternative, the SBA and the FDIC suggest that the statute must be applied prospectively so that it is not applicable to affect their preexisting liens.

The rules of construction relating to the constitutionality and retrospective application of statutes are well known. "The constitutionality of a statute is presumed; all doubt must be resolved in favor of its validity. The purpose of all rules of statutory construction is to ascertain the intention of the legislature as expressed in the statute." *Joe Self Chevrolet, Inc. v. Board of Sedgwick County Comm'rs*, 247

---

**16.** Since *Knight II* was decided after the parties filed their briefs, they do not mention it.

**17.** The trouble with the *Knights* approach is the inconsistency that will result when the bankruptcy petition is an involuntary one. There would still be a transfer to the bankruptcy estate, but K.S.A. 79–2020 would arguably not apply because the transfer would not be voluntary.

Kan. 625, 633, 802 P.2d 1231 (1990). A statute will not be stricken down unless it "clearly appear[s] that the statute violates the constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done." *Id.* at 635, 802 P.2d 1231 citing *State v. Huffman,* 228 Kan. 186, Syl. ¶ 1, 612 P.2d 630 (1980).

█ Unless a statute is clear on its face that it will have a retroactive effect, it is presumed to operate prospectively only. "The general rule, however, is that a statute operates only in the future from its effective date; that it has no retrospective effect unless its language clearly indicates that the legislature so intended, and that retrospective application is not to be given where vested rights will be impaired." *Johnson v. Warren,* 192 Kan. 310, 314, 387 P.2d 213 (1963), citing *Bulger v. West,* 155 Kan. 426, 430, syl. 1, 125 P.2d 404 (1942); *International Mortgage Trust Co. v. Henry,* 139 Kan. 154, 30 P.2d 311 (1934); *Davis, Administrator v. Union Pacific Railway Co.,* 206 Kan. 40, 476 P.2d 635 (1970); *Ohio Cas. Ins. Co. v. State Farm Auto. Ins. Co.,* 601 F.Supp. 345 (1984); *Tew v. Topeka Police & Fire Civ. Serv. Comm'n,* 237 Kan. 96, 697 P.2d 1279 (1985).

In *Davis, Administrator v. Union Pacific Railway Co.,* 206 Kan. at 46, 476 P.2d 635, the court stresses that the rule applies when the effect of the statute's retrospective application would impair rights acquired before its passage:

... retrospective legislation which attempts to impair rights or deprive a private litigant of a right he had at the time the later statute was enacted cannot be enforced. (*Richards v. Comm'rs of Wyandotte Co.,* 28 Kan. 326, 331; *Barrett v. Montgomery County,* 109 Kan. 685, 201 Pac. 1098; *Serrault v. Price,* 125 Kan. 548, 265 Pac. 548 [63]; *Almquist v. Johnson,* 130 Kan. 417, 286 Pac. 217 [200].)

*Ohio Cas. Ins. Co. v. State Farm Auto. Ins. Co.,* 601 F.Supp. at 348, focuses on legislative intent and the effect of retroactive application on prior substantive rights:

In Kansas, the general rule of statutory construction is that a statute will operate prospectively only unless the legislature clearly expresses the intent that it operate retrospectively.... It is particularly important to apply the above rule to statutory construction when a new statute may alter the substantive rights of the parties.

## VII

"It is uniformly recognized that the power to levy taxes is inherent in the power to govern, but the exercise of that power is dependent upon the existence of legislation designating the kinds of property to be taxed. The authority to impose taxes rests with the legislature." *Joe Self Chevrolet, Inc. v. Board of Sedgwick County Comm'rs,* 247 Kan. 625, 632, 802 P.2d 1231 (1990). When the focus of the power is enforcement through tax liens and the preferring of tax liens over other interests in the property taxed, it has been said:

The legislature may make tax liens a first lien upon the property of the taxpayer, giving them priority over a mortgage or any other lien existing against the property, whether created before or after the assessment of the tax; in most jurisdictions statutes giving such priority to tax liens have been enacted. Unless restricted by the state constitution, the legislature has full power to determine whether a tax lien shall be superior to other liens. Statutes giving tax liens priority over all other liens and encumbrances are not in contravention of any constitutional prohibition. Indeed, it is essential, in order that the state may collect its revenue and carry on the public business, to make such a tax a paramount lien.

72 Am.Jur.2d, State and Local Taxation, § 898, page 194, (1974).

The following cases and annotations underscore this power: *State of Kansas ex rel. White v. Kansas City,* 134 Kan. 157, 4 P.2d 422 (1931); *Krumpelman v. Louisville, Etc. Sewer District,* 314 S.W.2d 557,

75 A.L.R.2d 1110 (Ky.1958); V. Woerner, Annotation, *Superiority of special or local assessment lien over earlier private lien or mortgage, where statute creating such special lien is silent as to superiority,* 75 A.L.R.2d 1121 (1958) (statutes creating first lien for the cost of special assessments to improve public property such as transportation systems and sewers can grant priority over pre-existing mortgages, even where the prior mortgages antedate the enactment of the statute since the prior lienholder will share in the increase in value brought about by the improvement); *Scottish American Mortg. Co. v. Minidoka County,* 47 Idaho 33, 272 P. 498 (1928); E.L.D., Annotation, *Priority over existing lien, of statutory lien upon real property for personal-property taxes,* 65 A.L.R. 677 (1928) (taxes on personal property can become a lien on taxpayer realty, but there is a split of authority on whether the tax lien can gain priority over an existing lien); *International Harvester Credit Corp. et al. v. Goodrich et al., Constituting the State Tax Commission of New York,* 350 U.S. 537, 76 S.Ct. 621, 100 L.Ed. 681 (N.Y. 1956); *State of Washington v. Hi–Lo Foods, Inc.,* 62 Wash.2d 534, 383 P.2d 910 (1963) (taxes on personal property can be declared by statute to be liens paramount to prior liens and encumbrances thereon).

Except for those on special assessments for public improvements, these cases involve liens or security interests obtained after the enactment of the statute creating the tax lien.

Kansas has recognized the power to prefer tax liens. In construing K.S.A. 79–2111, the Kansas Supreme Court said in *Joe Self Chevrolet, Inc. v. Board of Sedgwick County Comm'rs,* 247 Kan. 625, 634, 802 P.2d 1231 (1990):

> The language of 79–2111 simply states if personal property of a taxpayer is seized by legal process, under certain stated circumstances, the delinquent taxes due shall be paid from the proceeds of the sale of the property in preference to all other claims against the property sold.

A preference is a right held by a creditor, by virtue of a lien or security, to be preferred above all others, i.e., paid first out of the debtor's assets subject to the creditor's claims.

However, in *Joe Self Chevrolet,* the court had under consideration a 1943 tax statute that created a preference over existing security interests. The security interest sought to be subordinated was obtained after the enactment of the statute creating the tax lien. Therefore, the statute was presumed to be embodied within the agreement creating the security interest. There was no attempt to apply a tax lien statute retrospectively in the sense that it affected liens created before its enactment in 1943.[18]

## VIII

■ In this case, K.S.A. 79–2020 was enacted July 1, 1985. The mortgage liens and security interests of the SBA and the FDIC were in existence many years before the enactment of the statute. The SBA took its lien on September 2, 1977, and the FDIC on August 13, 1981.

Where a state statute creates a tax lien on property but subordinates liens on the property that were in existence before its enactment, it has been stated:

> It is doubtful whether a statute declaring tax liens to be superior to other liens against the premises can constitutionally supersede liens, mortgages, or encumbrances created before the passage of the statute, and as a rule of construction, a statute which in general terms gives priority to a lien for taxes will not be given a retroactive effect so as to make it applicable to taxes previously assessed, or to liens existing at the time of the enactment of the statute.

72 Am.Jur.2d, State and Local Taxation, § 898, page 195.

This principle is recognized in *Minneapolis Threshing Mach. Co. v. Roberts County,* 34 S.D. 498, 503, 149 N.W. 163

---

**18.** Even so, the court found that K.S.A. 79–2111, while not unconstitutional per se, was applied unconstitutionally to impair vested due process rights.

(1914), in the context of a personal property tax lien dispute, albeit *dicta:*

> It is argued by appellant that, if the statute under consideration is given the construction contended for by respondent, it will burden personal property with secret liens to an extent to be abhorred; that it will act as a restraint upon the free exchange and alienation of personal property and render it unsafe to deal in personal property; that it will violate contract obligations and result in the taking of property without due process of law. *While the latter objection might be good in regard to contracts that were made prior to the enactment of the statute, it is without force when applied to contracts entered into since its enactment.* The results complained of are presumed to have been in contemplation of the parties when the contract was made. If the statute is obnoxious because it acts as a restraint upon the free exchange or alienation of personal property, or renders it unsafe to deal in such property, then it should be repealed or amended, but this relief must be sought from the Legislature and not from the court. (Emphasis added.)

The principles germane to retrospective application of federal and state legislation that may interfere with vested rights or impair obligations of contracts have been well articulated. *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982); *Louisville Joint Stock Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935); *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke, Virginia et al.,* 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937); *Wright v. Union Central Ins. Co.,* 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938); *Wright v. Union Central Ins. Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Hanover National Bank v. Moyses,* 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902); *Home Bldg. & Loan Asso. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1933); *Energy Reserve Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

But, the early decision of *Finn v. Haynes,* 36 Mich. 63 (1877), is the only case this Court has found in which retrospective application of a statute creating a tax lien threatened a pre-enactment lien.

Finn owned a tavern which he leased to Husbands in 1874. Husbands gave Finn a chattel mortgaged dated February 1874 to secure the sum of $800 he owed Finn. The articles mortgaged were bedding, bedsteads, dishes, and the like in the tavern.

Husbands operated the tavern but failed to pay the taxes. Under a law passed in 1875, the county treasurer issued a warrant which was delivered to the sheriff, Haynes, who passed it to Peck, his deputy, with instructions to seize the goods covered by the chattel mortgage.

Prior to service of the warrant, the mortgage had fallen due and Finn had taken possession of the mortgaged property and begun foreclosure on December 3, 1875. After Finn got the property, he stored it in several rooms of the tavern and fastened the doors and windows. He did this with the consent of Husbands.

On December 5, 1875, the sheriff, through his deputy, levied the warrant on the stored goods, knowing that Finn held a mortgage, that he was owed $800, that he had taken possession of the goods, and that he was foreclosing. The goods were worth $161.50.

Finn brought trover against Haynes and Peck for conversion. The case was tried to a jury which found for Finn in the amount of $161.11, upon a charge that "if they found the goods were not in the bar room, or any part of the bar fixtures, nor used in connection therewith, then the defendants were not justified in taking them from the possession of the plaintiff and they should find for the plaintiff." Defendant excepted to the charge, making certain arguments based upon the language of the statute giving the tax lien preference. The court ruled:

> ... The case shows conclusively that the plaintiff's mortgage was made some time before the statute in question was enacted, and if the legislature had made the act expressly applicable as against ante-

cedent contracts, it would have been necessary to consider its constitutional validity. But such is not the case.

It is true the language is general, but it is still subject to the rule of interpretation which imputes an intention *against* retrospective action unless the terms clearly indicate an intention *in favor* of it. Cooley on Const. Lim., 370, and cases; *Harrison v. Metz*, 17 Mich., 377; *Clark v. Hall*, 19 Id., 356; *Smith v. Auditor General*, 20 Id., 398. And surely, before venturing to assume the existence of any such purpose, it would be necessary to find the will of the legislature very distinctly expressed in favor of making new tax levies have preference over lawful securities given before the statute. The provision, then, giving superiority to the tax process over "liens, mortgages, conveyances and encumbrances" cannot be held to apply to "liens, mortgages, conveyances or encumbrances" created before the act of 1875 was passed.

The plaintiff's mortgage was not therefore subject to be overridden by the tax process which the defendants executed, and the ruling of the court was not injurious to them. The judgment should be affirmed, with costs.

The other Justices concurred.

*Finn v. Haynes*, 36 Mich. 63, 65 (1877).

■ To give K.S.A. 79–2020 the effect of creating a superior lien on the property is to apply it retroactively to deprive the SBA and the FDIC of their prior liens rights. While no doubt, as the cited cases attest, the statute can subordinate liens created after its enactment, the Court discerns nothing in its text evidencing a legislative intent that it be applied to liens antedating its effective date.

## IX

■ The last sentence of the statute contains the following automatic lien expiration provision:

> No personal property which has been transferred in any manner after it has been assessed shall be liable for the tax in the hands of the transferee after the expiration of three years from the time such tax originally became due and payable.

As we have seen, in Kansas personal property taxes are assessed on January 1, become due on November 1, and become payable (thus "due and payable") on December 20 of each tax year. K.S.A. 79–2020 automatically relieves the transferred property in the hands of the transferee from liability for the tax "after the expiration of three years from the time such tax originally became due and payable." If this language means that we should look to the general scheme of personal property taxation in Kansas when deciding if three years has passed from the time the tax "originally became due and payable," then we would have to conclude that personal property taxes for the years 1982,[19] 1983, 1984, and 1985 "originally" became due and payable on December 20 of each of those years. If this were the meaning of the statute, by its terms the tax liens for the years 1982, 1983, 1984, and 1985 would have expired on December 20 of 1985, 1986, 1987 and 1988, respectively. But this makes no sense because a tax lien on the assessed property in the hands of the transferee was not created until the voluntary transfer occurred at the filing of bankruptcy on April 16, 1986.

The statute must mean to limit the phrase "such tax originally became due and payable" to assessed, unpaid taxes that become due and payable upon the "surrender or transfer" mentioned in the statute, i.e., those taxes made "due and payable" from the filing of the bankruptcy petitions, as the following language could be taken to mean:

> If any owner of personal property *surrenders* or *transfers* such property to another after the date such property is assessed and before the tax is paid, whether by voluntary repossession or any other voluntary act in reduction or satisfaction of indebtedness, *then the taxes on the personal property of such taxpayer shall fall due immediately,*

19. Paragraph one of the Stipulation removes taxes assessed in 1982 from controversy.

*and a lien shall attach to the property so surrendered or transferred, and shall become due and payable immediately.* (Emphasis added.)

If this is the meaning of the statute, then no lien would exist after three years from the date of the filing of the bankruptcy petitions. Since the Chapter 11 petitions were filed April 16, 1986, three years later would fall on April 16, 1989. On this date, the tax lien would automatically expire. Of course, the estate no longer has the property; it has the sale proceeds. But the estate had the property until it was sold on July 26, 1989. This was after the last tax lien would have expired on April 16, 1989. Unless the automatic statutory expiration period was tolled, the tax liens for all the years at issue expired before the sale of the property so that no lien existed to be transferred to the sale proceeds.

Was the time tolled by the Chapter 11 filings? If it was, it had to occur under 11 U.S.C. § 108 or under some state statute. Nothing in 11 U.S.C. § 108 appears to toll an automatic lien expiration period such this one. Likewise, the Court knows of no state tolling statute that suspends such a time limit. Consequently, the Court rules that by the express terms of the statute itself there is no tax lien burdening the sale proceeds.

## X

Accordingly, the Court sustains the objections of the SBA and the FDIC to the trustee's "Application for an Order Approving and Confirming Sale Free and Clear of Liens and Encumbrances of Record and Dispersal of Proceeds" and rules that Reno and Sedgwick Counties are not entitled to tax liens against the debtors' oil and gas leases by virtue of K.S.A. 79–2020, nor against the proceeds of their sale.

The foregoing discussion shall constitute findings of fact and conclusions of law under Bankruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.